J-A30010-18

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| DR. ROGER STEWART | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DR. GREGORY NICOSIA | : | No. 45 WDA 2018 |
| INDIVIDUALLY; AND DR. GREGORY | : | |
| NICOSIA PARTNER TRADING AS | : | |
| ADVANCED DIAGNOSTICS; AND | : | |
| ADVANCED DIAGNOSTICS, INC. | : | |

Appeal from the Judgment Entered December 5, 2017
In the Court of Common Pleas of Allegheny County Civil Division at
No(s): GD-01-013980,
GD-01-014628

BEFORE: SHOGAN, J., KUNSELMAN, J., and STRASSBURGER*, J.

MEMORANDUM BY SHOGAN, J.: FILED APRIL 15, 2019

Appellant, Dr. Roger Stewart, appeals from the judgment entered December 5, 2017, in the Court of Common Pleas of Allegheny County. After careful review, we affirm.

This complex litigation has a lengthy procedural history. This case stems from disagreements regarding a chiropractic business involving two former friends. Appellant is a licensed chiropractor. Dr. Gregory Nicosia ("Nicosia") is a psychologist without a chiropractic license. The two formed a business wherein Appellant provided chiropractic treatments to the public and supervised staff, while Nicosia managed the money for the business. On July 17, 2001, Appellant sued Nicosia at docket number GD-01-013980

_____

* Retired Senior Judge assigned to the Superior Court.

(Equity) for: 1) a declaration of partnership between the two men as to the chiropractic business; 2) an accounting of the financial activity of the chiropractic business on a year-by-year basis; and 3) a receiver for chiropractic assets.

On July 24, 2001, Appellant sued Nicosia at docket number GD-01-014628 (Law) for 1) breach of contract; 2) fraud; 3) unjust enrichment; 4) conversion of chiropractic property; 5) violations of Pennsylvania's Wage Payment Law; and 6) piercing of the corporate veil. On May 28, 2002, Appellant filed an amended complaint at law, containing the same six causes of action. On July 3, 2002, Nicosia filed an answer to Appellant's amended complaint, and also filed a counterclaim, alleging that Appellant owed him money.

On March 3, 2003, Appellant filed an amended complaint in equity and on March 6, 2003, Appellant filed his second amended complaint in equity, which contained the same causes of action. On March 10, 2003, Appellant's causes of action in equity and at law were consolidated for trial.

On July 1, 2003, Allegheny County Court of Common Pleas Judge Livingstone M. Johnson stated that he would divide the actions into three trial phases: Phase One, Appellant's declaratory action for a partnership; Phase Two, Appellant's accounting action; and Phase Three, the causes of action at law and Nicosia's counterclaim. On September 25, 2003, Appellant filed an amended complaint at law and added a cause of action for

breach of partnership fiduciary duties. Nicosia answered the complaint and denied the averments.

From September of 2003 through March of 2005, Judge Johnson conducted trial of Phase One and concluded that a partnership existed between the parties, in agreement with Appellant's position, and entered an order accordingly on September 14, 2005. The parties filed post-trial motions. Nicosia filed an appeal that was quashed as interlocutory by this Court on March 20, 2008. Stewart v. Nicosia, 946 A.2d 1103 (Pa. Super. 2008).

Judge Johnson's September 14, 2005 order also set forth the matter that would be covered by Phase Two: the accounting. Phase Three was expected to handle the claims at law set forth at docket number GD 01-14628.

In July of 2008, Judge Christine A. Ward was appointed to handle the consolidated matters. An accountant was appointed to perform the accounting of the chiropractic business (Phase Two), pursuant to paragraphs seven, eight, and nine of Judge Johnson's September 14, 2005 order.

In January of 2016, the consolidated cases were assigned to Judge Judith L. A. Friedman. Because the court-appointed accountant was not able to finalize the accounting, the trial court took over the accounting and conducted a trial of Phase Two without appointing a different master. Trial Court Opinion, 6/9/17, at 3. Judge Friedman conducted a trial on Phase Two in May of 2017, and on June 9, 2017, entered an accounting in favor of Nicosia and against Appellant for $35,640.33. Id. at 15. Judge Friedman believed

that her factual findings during Phase Two left nothing to be tried in Phase Three, and in her June 9, 2017 memorandum, she indicated that she would enter an order cancelling Phase Three of the trial. Id. at 3. On June 27, 2017, the court entered an order reflecting same. Appellant filed several post-trial motions on July 7, 2017, and on the same date, Nicosia filed various motions, including a motion to dismiss the remaining claims as moot.

On August 7, 2017, Judge Friedman entered a judgment against Appellant in the amount of $119,019.16.[1] By order and memorandum entered October 25, 2017, the trial court granted Nicosia's motion to dismiss Appellant's causes of action at law (Phase Three) because Appellant failed to present "any valid basis for his contention that the above-listed counts at law are still viable." Trial Court Opinion, 10/25/17, at 4. The court also struck the judgment for $119,019.16, as being prematurely entered. Id. at 4.

On December 5, 2017, Judge Friedman dismissed the litigants' post-trial motions and entered judgment against Appellant in the amount of

---

[1] This judgment included $35,640.33, the amount determined to be owed to Nicosia through the accounting. Trial Court Opinion, 6/9/17, at 15. It also included pretrial and post-trial interest on the $35,640.33, in the amount of $38,758.86. Further included were the fees paid to Mr. Ickert, the court-appointed accountant, by Nicosia in the amount of $44,619.97. Trial Court Opinion, 8/7/17, at 5.

$119,019.26.[2]  Trial Court Opinion, 12/5/17, at 1-3.  On January 4, 2018, Appellant filed a notice of appeal.  On January 26, 2018, Appellant filed his Pa.R.A.P. 1925(b) statement, and on February 20, 2018, Judge Friedman filed her Pa.R.A.P. 1925(a) opinion.[3]

Appellant presents the following issues for our review:

1.    Whether the first trial court, Judge Johnson, correctly concluded the Chiropractic Business at issue was a partnership, and that Dr. Nicosia, as an unlicensed person, could not legally be the 100% owner of the Chiropractic Business as a "division" of his corporation Advanced Diagnostics PC.

2.    Whether Dr. Nicosia, as an unlicensed individual, could legally be a 50% partner in the Chiropractic Business with [Appellant] a licensed chiropractor, the other 50% partner.

3.    The third trial court, Judge Friedman, incorrectly concluded that if the Chiropractic Business is an illegal partnership, then [Appellant] was in pari delicto with Dr. Nicosia and not entitled to any relief.

4.    Whether the accounting determined by the third trial court, Judge Friedman, must be overturned because it did not account for the substantial amount of chiropractic revenue which both litigants claim is still missing.

5.    Whether the second trial court, Judge Ward, and the third trial court, Judge Friedman, abused their discretion, and committed an [sic] errors of law, in the manner in which they handled the accounting phase - including subsidy questions per Pa R.A.P. Rule 2111(b).

_____

[2]  We note the inconsistency in the identified award amount in the August 7, 2017 order, but do not find this discrepancy to impact the outcome of this matter.

[3]  Appellant subsequently filed a Combined Motion and Brief on March 8, 2019, and a Motion and Combined Reply Brief on March 27, 2019, with this Court. These motions are denied as moot in light of our holding herein.

6.      Whether the third trial court, Judge Friedman, abused her discretion, and committed an error of law, by her dismissal as "moot" the third phase of Stewart v. Nicosia, which included dismissal of [Appellant's] seven causes of action at law at GD-01-014628.

Appellant's Brief at 5 (emphases in original).

Appellant's first three issues pertain to the trial court's findings as related to his partnership with Nicosia. Appellant first asserts that Judge Johnson correctly ruled that the chiropractic business was a partnership. Appellant's Brief at 22. Appellant furthers this position by stating that:

There [were] more than sufficient facts and circumstances for Judge Johnson to conclude that the Chiropractic Business was a 50%-50% partnership between [Appellant] and [Nicosia], including that the litigants agreed to split 50%-50% the profits and losses from the Chiropractic Business.

Id. Despite these assertions, Appellant then states that "[Nicosia], as an unlicensed person, violated Section 2922(a) of the PA Professional Corporation Law in his attempt to be the sole owner of the Chiropractic Business." Id. at 24. He further inexplicably mentions Judge Johnson's observation during the Phase One trial that if Nicosia were the sole owner of the chiropractic business, such action would be unlawful. Id. at 25.

We are unable to discern what, if any, challenge Appellant is attempting to raise in this issue. Judge Johnson indeed agreed with Appellant's position that there was a fifty-fifty partnership, and entered an order consistent with that determination. Order, 9/14/05, at 1-2. Judge Johnson did not declare it

to be an illegal partnership. Id. Thus, Appellant is entitled to no relief on this issue.

Appellant next argues that Nicosia, an individual without a chiropractic license, could not legally be a fifty percent partner in the chiropractic business with Appellant, a licensed chiropractor and the other fifty percent partner. Appellant's Brief at 26. Generally, Appellant asserts that because Nicosia was an unlicensed entity, he could not be a fifty percent partner in a professional partnership, and therefore the partnership was illegal. Id. at 27-28.

We first note that Appellant failed to raise this issue before Judge Johnson during Phase One of the litigation relating to the partnership. Moreover, throughout litigation at the trial phase, it was Appellant's position that the chiropractic business was a lawful partnership. Complaint, 7/17/01; Complaint, 7/24/01; Amended Complaint, 5/28/02. Accordingly, Appellant cannot now argue that it was not a lawful partnership. Indeed, in Issue one of his appellate brief, as discussed above, Appellant asserts that Judge Johnson correctly determined that the chiropractic business was a lawful partnership owned equally by the parties. "Issues not raised in the lower court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a). Thus, this issue is waived and Appellant is entitled to no relief on this claim.

In his third issue, Appellant argues that Judge Friedman incorrectly concluded that if the chiropractic business was an illegal partnership, then

Appellant was in pari delicto with Nicosia and not entitled to any relief. Appellant's Brief at 30. Appellant maintains that in this case, Nicosia is the "sole culpable party on the illegal issue." Id. Appellant further states:

> This is because, as Judge Johnson found, [Nicosia] had knowledge prior to the start of the Chiropractic Business it was likely illegal under Pennsylvania law for him to be the 100% owner of the Chiropractic Business.
>
> [Appellant], however, did not have any knowledge of the illegality issue until [Nicosia's accountant, Mr. Gerson] testified about it during the partnership trial. Further, Mr. Gerson testified he did not share his research on the illegality issue with [Appellant]. As such, [Nicosia] can not obtain court relief while [Appellant] can obtain court relief.

Id. at 30 (emphasis in original, internal citations omitted).

We again note that there was no finding by the trial court that the chiropractic business was an illegal partnership. As Judge Friedman noted in her Pa.R.A.P. 1925(a) opinion:

> Judge Johnson, not [Judge Friedman], agreed with [Appellant's] position that there was indeed a partnership. He declined to declare it an "illegal" partnership but rather concluded that it was a 50-50 partnership which needed to be wound up and entered an order by which the First Phase of the trifurcated trial was concluded. Furthermore, [Appellant] would be in pari delicto with [Nicosia] regarding the existence of an illegal chiropractic partnership and would not be entitled to any relief from the [c]ourt.

Trial Court Opinion, 2/21/18, at 6 (emphasis in original). Judge Friedman simply observed that if there were an illegal partnership, Appellant would be in pari delicto with Nicosia, and therefore not entitled to any relief. She did

not make that statement as a finding. Thus, Appellant is not entitled to relief on this issue.

In his fourth issue, Appellant argues that the accounting must be overturned because it did not account for the substantial amount of chiropractic revenue which both litigants claim is still missing. Appellant's Brief at 31. Appellant asserts that during discovery, Nicosia testified that after the chiropractic business ended, Nicosia and his wife:

> [r]eviewed the patient files in the Greycat Computer, and compared those entries to the patient paper records, and they compiled a "big long list" of patients who received chiropractic services, were billed for those services, but that the money which was paid for those services was missing.

Id. at 31 (emphases in original). Appellant further contends that there was a dispute as to whom the list of patients and services was given, but asserts that it was never provided to him. Id. Appellant posits that the accounting did not include the amounts of missing money, and as a result, the case must be remanded for a more accurate accounting of chiropractic revenue with a focus on this missing money. Id.

We first note that Appellant has failed to identify where in the record he raised this issue before the trial court, either during the accounting phase of trial or in post-trial motions. "Issues not raised in the lower court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a).

Moreover, we shall not assume the burden of searching through the voluminous record in this case in an attempt to determine whether Appellant

raised this issue before the trial court. "This Court will not act as counsel and will not develop arguments on behalf of an appellant." Irwin Union Nat. Bank and Trust Co. v. Famous, 4 A.3d 1099, 1103 (Pa. Super. 2010). It is not this Court's responsibility to comb through the record seeking the factual underpinnings of a claim. Id. When deficiencies in a brief hinder our ability to conduct meaningful appellate review, we may dismiss the appeal entirely or find certain issues to be waived. Id.; Pa.R.A.P. 2101. Because Appellant failed to establish that this issue was raised before the trial court and such failure hinders our ability to conduct meaningful appellate review, we find this claim to be waived. Pa.R.A.P. 2101.

Even if the issue had not been waived, we would conclude that it lacks merit. As referenced in the trial court's June 9, 2017 decision addressing Phase Two of the litigation related to the accounting, the court was aware of the patient files and billing as included in the Greycat computer system utilized for the partnership. Trial Court Opinion, 6/9/17, at 6-15. Specifically, the trial court stated the following with regard to the Greycat billing information:

> We therefore find that [Appellant's wife] made the complete Greycat billing printouts, probably to be sure [Appellant] had those billing records; we believe it is more likely than not that he had his own patient treatment records for his current patients in his Mt. Troy office and therefore only needed the Greycat printouts to be able to follow up regarding monies that might be due him from the Shadyside practice.

Id. at 11. Therefore, Appellant had the information from the Greycat system that he alleges to have been missing. Moreover, the trial court made the

- 10 -

following finding: "There was sufficient evidence available for a reasonably accurate accounting of the revenue and expenses and profits and losses of the partnership to be made." Id. Thus, there is no evidence that a substantial amount of revenue was missing from the records supporting the accounting. As such, we would not conclude that the trial court erred in conducting the accounting.

In his fifth issue, Appellant argues that "the second trial court, Judge Ward, and the third trial court, Judge Friedman, abused their discretion, and committed an errors [sic] of law, in the manner in which they handled the accounting phase–including subsidy questions per Pa R.A.P. Rule 2111(b)."[4] Appellant's Brief at 5. Despite presenting this single issue in his statement of questions involved, Appellant attempts to expand this vague single issue into an additional eight "sub-issues" in the argument section of his brief. Id. at 32-43. The Rules of Appellate Procedure provide that issues to be resolved must be included in the statement of questions involved or "fairly suggested" by it. Pa.R.A.P. 2116(a). "[Pa.R.A.P. 2116(a)] is to be considered in the highest degree mandatory, admitting of no exception; ordinarily, no point will be considered which is not set forth in the statement of questions involved or suggested thereby." Thomas v. Elash, 781 A.2d 170, 177 (Pa. Super. 2001);

_____

[4] We note that Pa.R.A.P. 2111(b) relates to the contents of an appellate brief and the requirement that an opinion from the trial court be appended to the brief. Accordingly, we are uncertain of the reason or basis for Appellant's citation to that rule in the context of this issue.

see also Wirth v. Com., 95 A.3d 822, 858 (Pa. 2014)). These sub-issues are not included in the statement of questions involved, nor are they "fairly suggested" by the extraordinarily vague issue listed in the statement of questions involved. Thus, we hold that Appellant has waived these claims. Graziani v. Randolph, 856 A.2d 1212, 1216 (Pa. Super. 2004).

Moreover, review of these eight sub-issues reveals that at least two of them were not raised in Appellant's Pa.R.A.P. 1925(b) statement. Specifically, in Appellant's sub-issue "A," he asserts that Judge Ward and Judge Friedman erred in failing to apply Clement v. Clement, 260 A.2d 728 (Pa. 1970), to shift the burden in the accounting phase to Nicosia. Appellant's Brief at 32. This issue was not raised in Appellant's Pa.R.A.P. 1925(b) Statement. Pa.R.A.P. 1925(b) statement, 1/26/18, at 1-13. Further, Appellant's sub-issue "B" alleges error by Judge Ward in the appointment of an alleged incompetent witness. Appellant's Brief at 34. Review of Appellant's Pa.R.A.P. 1925(b) statement shows no allegation of abuse of discretion or error by Judge Ward. Pa.R.A.P. 1925(b) statement, 1/26/18, at 1-13. Because these issues were not raised in his Pa.R.A.P. 1925(b) statement, they would be waived on this basis as well. See U.S. Bank, N.A. for Certificateholders of LXS 2007-7N Trust Fund v. Hua, 193 A.3d 994, 997 (Pa. Super. 2018) ("Any issues not raised in a Pa.R.A.P. 1925(b) statement will be deemed waived.") (quoting Commonwealth v. Lord, 719 A.2d 306, 309 (Pa. 1998)).

Moreover, the trial court conducted a thorough accounting as is reflected in its June 9, 2017 decision. We conclude that the trial court did not abuse its discretion in preparing the accounting, and to the extent that the sub-issues raised in Appellant's brief under heading "Argument #5" are not waived, we would affirm on the basis of that opinion.[5]

In his final issue, Appellant argues that Judge Friedman abused her discretion and committed an error of law in dismissing as "moot" the third phase of the trial, which resulted in dismissal of Appellant's seven causes of action at law. Appellant's Brief at 43. Appellant maintains that he had viable claims remaining against Nicosia, including claims of unjust enrichment and breach of fiduciary duties. Id. at 43. The trial court addressed this issue in its October 25, 2017 memorandum. Therein, the trial court explained that, given the findings and determinations made during Phase Two of the litigation, there were no viable claims at law remaining against Nicosia. Trial Court Opinion, 10/25/17, at 3-4. Specifically, the trial court explained:

> All of the claims at law arise from the relationship between the parties, which [Appellant], in Phase One, had successfully asserted was an "oral at-will partnership." However, during the Phase Two accounting, the material facts supporting each of these claims at law were decided adversely to [Appellant]. After consideration of the arguments of counsel, we conclude that the claims, as we suspected, are indeed moot. There is no count at law that remains to be tried. Crucial elements, if not all elements of each of the above claims, have already been decided, adversely to [Appellant].

---

[5] The parties are instructed to attach a copy of the trial court's June 9, 2017 decision to further pleadings in this matter.

One important missing element is harm to [Appellant]. The accounting of the partnership revealed that [Appellant] suffered no harm.

Another missing element is wrongdoing by [Nicosia]. The accounting revealed that [Nicosia] had not acted wrongfully at all, and, in fact, that it was [Appellant] who did so, by, inter alia, misappropriating funds that should have gone into the partnership's "main account," the Advanced Diagnostics checking account at PNC Bank.

Another significant finding of fact in Phase Two is that the partnership made no profit so there was nothing to be distributed to [Appellant]. There can be no wrongful withholding of distributions if there was nothing to distribute.

Regarding the Wage Payment Law/Act violations, [Appellant] successfully contended that he and [Nicosia] were 50-50 partners, and presented no evidence during the Phase Two Accounting regarding unpaid salaries, an item that certainly should have been part of the accounting.

Regarding conversion, the evidence and factual findings at Phase Two belie [Appellant's] assertions that [Nicosia] converted chiropractic equipment to his own use.

The evidence and factual findings at Phase Two also make it clear that [Appellant], not [Nicosia], ended the partnership when he walked out at the end of April 1999.

Trial Court Opinion, 10/25/17, at 3-4 (emphasis in original).

We agree with the trial court's conclusion regarding Appellant's final issue and affirm on the basis of its October 25, 2017 memorandum.[6]

Accordingly, Appellant is entitled to no relief on this claim.

Judgment affirmed. Application for relief denied.

_____

[6] The parties are instructed to attach a copy of the trial court's October 25, 2017 decision to further pleadings in this matter.

- 14 -

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/15/2019

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | | |
|---|---|---|
| DR. ROGER STEWART, | ) | CIVIL DIVISION |
| | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | Consolidated Cases known as |
| | ) | GD-01-13980 (Equity) |
| | ) | GD-01-14628 (Law) |
| vs. | ) | |
| | ) | |
| DR. GREGORY NICOSIA, individually, | ) | |
| and DR. GREGORY NICOSIA, partner | ) | |
| trading as ADVANCED DIAGNOSTICS, | ) | |
| and ADVANCED DIAGNOSTICS, INC., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## DECISION

This Decision is entered pursuant to Pa.R.C.P. 1038. See also Pa.R.C.P. 227.1.

## INTRODUCTION

The non-jury trial of the accounting phase of the captioned consolidated matters, also referred to as Phase 2, was completed before the undersigned on May 26, 2017. Proposed Findings of Fact and briefs in lieu of oral closings were due on June 6, 2017. Counsel for Plaintiff also made a brief oral argument at the end of the trial. Defendants timely filed their proposed findings and briefs; Plaintiffs were unable to do so. As of June 8, 2017, the date the Court began editing and finalizing its own draft findings (made on May 26 and 27), counsel for Plaintiffs had sent an e-mail indicating that he might be able to get his proposed findings and brief later on June 8 or

1

some time on June 9. We indicated that we planned to file this Decision on June 9, the deadline that suited the court's convenience and our other responsibilities.

As a result of the Plaintiff's delay in filing, this Decision is in a clumsier form than I would have wished. Instead of referring to specific proposals by each party, as I had planned, I have listed my initial findings more or less as first drafted, followed by a list of the numbers of Defendant' proposed findings with which I concur and which are consistent with my own findings. I have included at the end of that list a small number that I would have modified slightly but which are essentially consistent with my thoughts. I have not confirmed the accuracy of all of Defendants' citations to exhibits and they are to be used only as a suggestion although I expect that most are accurate. Proposed findings that were not accepted seemed irrelevant or duplicative. Had Plaintiffs proposed findings been sent in time to be considered, they would have been listed in the same way, with whatever caveats seemed appropriate. This Decision was in final form at 7:00 PM on June 8, 2017, and nothing had been received by e-mail or otherwise by then.

PROCEDURAL BACKGROUND

The docket of the cases reflects the long procedural history of the dispute. The Honorable Livingstone M. Johnson trifurcated the trial of the captioned consolidated actions and tried the first phase over the course of two years from the Fall of 2003 until the Fall of 2005. He entered an order, dated September 14, 2005, in which he determined that there was indeed a partnership between the captioned individuals, two former friends, Dr. Roger Stewart, a chiropractor, and Dr. Gregory Nicosia, a psychologist. This order was docketed on September 16 as were the Findings of Fact and Conclusions of Law made by Judge Johnson.

2

Judge Johnson also set forth in paragraphs 7, 8, and 9 of that order the scope of this second phase, the accounting of the partnership. This phase of the matter was initially assigned to the Honorable Christine A. Ward, who appointed a certified public accountant to do the accounting on February 4, 2009, after the parties were unable to agree on one. In January 2015, the undersigned agreed to take over these cases to help Judge Ward, who handles most of the complex litigation matters for our Court.

The undersigned eventually realized that the court-appointed accountant was not able to finalize the accounting although he clearly did a lot of work and organized the large amount of available information as best he could. Because the parties had spent a good deal of money over the years for the accountant's fees, we decided to take over the accounting and have a trial of that phase without appointing a different master. We directed the accountant to provide the electronic version of all the work he had done to counsel for the parties so that each could give that to his own accounting expert. The expectation was that each party's own accountant would use that data (rather than having to spend time re-creating it) and supplement it as he or she deemed appropriate and would then testify in the Phase 2 trial as to the opinion reached regarding who owed whom how much and why.

Because of our conclusion, explained below, that it is Dr. Stewart who owes money to the Dr. Nicosia, we have concluded that Phase 3 is moot and will consider entering an order to that effect at a later date.

Judge Johnson had made many findings of fact, some of which are relevant to the instant accounting. The Court makes the findings set forth below. The exhibits or testimony supporting

3

each finding can be found in the proposed findings of the Defendants, or possibly of the Plaintiffs, that are consistent with each finding of the Court.

FINDINGS OF FACT

1. Dr. Stewart and Dr. Nicosia were lifelong friends until the Spring of 1999.

2. At some time prior to August 1995, the parties agreed that Dr. Stewart would expand his existing practice to a second office in Dr. Nicosia's space in the building owned by Dr. Nicosia and his wife on Centre Avenue in Shadyside.

3. Their thought was that some of Dr. Nicosia's psychology practice patients at that office who also needed chiropractic treatment could receive that treatment easily if Dr. Stewart shared the office space.

4. To accomplish that purpose, they entered into a business relationship, which Judge Johnson deemed a partnership, in August 1995.

5. The terms of the partnership agreement are set forth in Judge Johnson's order of September 14, 2005, fully quoted below:

1. The Chiropractic business which was operated out of Dr. Nicosia's office building at 4927 Centre Avenue in the Shadyside area of Pittsburgh, which is the subject matter of the above lawsuit, was a partnership between Plaintiff Dr. Roger Stewart and Defendant Dr. Gregory Nicosia.

2. Dr. Roger Stewart was a fifty percent (50%) partner in the partnership and Dr. Gregory Nicosia was a fifty percent (50%) partner in the partnership.

3. The partnership began in August of 1995, and the partnership was later dissolved in May of 1999 under 15 Pa.C.S.A. Section 8351, but the partnership was never legally terminated under 15 Pa.C.S.A. Section 8352.

4. All property which was either originally, or subsequently, brought into the partnership is considered partnership property under 15 Pa.C.S.A. Section 8313(a).

5. Dr. Roger Stewart and Dr. Gregory Nicosia were co-owners of the property of the partnership as tenants in partnership under 15 Pa.C.S.A. Section 8342.

6. All partnership books and records are available for inspection and copying by any partner under 15 Pa.C.S.A. Section 8332.

7. Each partner is entitled to be repaid his contributions, whether of capital or property, and each partner shall share equally in the profits and surplus remaining after liabilities have been paid under 15 Pa.C.S.A. Section 8331(1) even if the specific dollar amount is determined by subsequent court proceedings.

8. Dr. Stewart and Dr. Nicosia are entitled to their respective fifty percent (50%) share of the residual financial assets of the partnership as of the date of its dissolution in May of 1999, including, but not necessarily limited to, any outstanding capital contributions, accounts receivable, profits, losses, and goodwill from the business under 15 Pa.C.S.A. Sections 8342, 8343, 8360, even if the specific dollar amount is determined by subsequent court proceedings.

9. Dr. Stewart and Dr. Nicosia are entitled to their respective fifty percent (50%) share of the residual non-financial assets of the partnership as of the date of its dissolution in May of 1999, under 15 Pa.C.S.A. Sections 8342, 8343, 8360, even if the specific items are determined by subsequent court proceedings.

6. Dr. Nicosia handled the finances of both practices by using the software known as Quicken which could easily generate a variety of financial reports for each practice.

7. Dr. Nicosia also handled all the bank accounts related to both practices.

5

8. Each practice was considered a "division" of Advanced Diagnostics, a trade name used by the two doctors, created at the time the relationship between the two doctors began.

9. Dr. Nicosia owned another entity known as Advanced Diagnostics, Inc. which was not part of the relationship between the two doctors and which has no impact on this accounting.

10. Dr. Nicosia gave Dr. Stewart monthly and yearly financial reports generated by Quicken for the Chiropractic practice and Advanced Diagnostics.

11. Both Dr. Stewart and Dr. Nicosia made loans to the Chiropractic practice part of Advanced Diagnostics.

12. There were no specific requests that Dr. Stewart cover any losses of the partnership, although the loans made were probably related to the fact that the Chiropractic practice was not bringing in enough money to cover payroll and its share of the common expenses.

13. There was a common reception area where the paper and electronic records of the Chiropractic practice were kept and computers for both practices were also kept.

14. There was also a common patient appointment book used by the staff of both practices.

15. The Chiropractic billing records were entered into a computer that ran Greycat software; this computer was generally referred to during the trial as "Greycat."

16. Greycat was used exclusively for the Chiropractic practice.

17. Greycat software is a billing record-keeping system that can produce HCFA forms for submission of claims to Medicare, Medicaid, and insurers; these forms included a direction that payment be made to Advanced Diagnostics.

6

18. Data was entered into the Greycat computer by staff shared by the two practices; the data only pertained to the Chiropractic practice.

19. Dr. Stewart was not able to use any of the office computers.

20. After entries were made in Greycat, the paperwork from which the entries were made was placed in the individual patient's billing file.

21. Each patient of the Chiropractic practice had paper versions of a treatment file and a separate billing file.

22. There was also a common billing file that contained copies of all the unpaid Chiropractic bills that had been sent out; this file provided a quick way to see which patients or providers needed to be reminded that the bill was outstanding and which bills needed to be sent out for collection.

23. It was unclear from the evidence whether the original patient billing files or copies were sent when a collection agency was asked to collect past due accounts receivables of the Chiropractic practice.

24. A large number of the chiropractic patients were covered by third-party payers.

25. When payments were made by Medicare, Medicaid or Insurers, they were accompanied by a form referred to as an EOB, an Explanation of Benefits.

26. When payments were made by lawyers who represented the patients in workers compensation or personal injury cases, they were accompanied by a cover letter.

27. Patients who were "self-pay" usually paid on the date of service, sometimes by credit card.

7

28. When payment checks came in, the standard procedure was to give them, along with the EOB (or, presumably, the lawyer's letter) to the staff member who was charged with depositing the checks into the Advanced Diagnostics checking account at PNC Bank; this account was referred to during the Phase 2 trial as the "main" account.

29. Only Dr. Nicosia was an authorized signatory of that account although Dr. Stewart on one occasion was authorized by Dr. Nicosia to sign a check for $5,000 in postage that needed to be sent out before the end of the year; there is no dispute regarding the propriety of this check.

30. After deposits were made, the copies of the check and the EOB (or cover letter) were put in the patient treatment file to reflect that payment had been made; they did not go back to the patient billing file.

31. The billings of the Psychology practice were done separately and were never considered by either party to be part of the partnership.

32. The monies received by the Psychology practice were, however, comingled in the "main" account with those of the Chiropractic practice and a third entity owned by Dr. Nicosia, called TEST 2.

33. Dr. Nicosia also owned a business known as TEST, sometimes referred to in the testimony during the instant Phase 2 trial as Test One; this business had a separate bank account and its monies were not comingled in the "main" account and have no impact on this accounting.

34. Even though the funds were comingled, they were separately designated in the Quicken records and also on the handwritten deposit slips so that each amount could be linked to the relevant doctor in the Chiropractic practice or to the Psychology practice or to TEST 2.

8

35. In early 1999, Dr. Nicosia asked his wife to review the patient billing accounts for his Psychology practice, which were in disarray, to figure out which patient bills were paid or unpaid.

36. Mrs. Nicosia's background indicates that she was qualified to perform such a review.

37. In the course of her review, she found a billing discrepancy regarding one of the psychology patients who also happened to be a patient of Dr. Stewart's Chiropractic practice.

38. She then checked the billing records of the Chiropractic practice on Greycat to see if payments had mistakenly been credited to the wrong patient account.

39. She discovered that chiropractic billings of roughly $20,000 for that patient showed a zero balance although no payments had been recorded.

40. She called the lawyer who was representing that patient and was informed that he had sent payment of a compromise amount of roughly $15,000 to Dr. Stewart's practice.

41. She brought this discrepancy to Dr. Nicosia's attention, indicating her suspicion that Dr. Stewart may have been keeping payments for himself rather than depositing them into the Main Account.

42. Dr. Nicosia did not believe Dr. Stewart would have done such a thing intentionally and asked his wife to investigate further.

43. She confronted Dr. Stewart with her findings and he denied that he had taken the $15,000 payment for himself.

44. Mrs. Nicosia then looked at other patient files via Greycat to find those that showed high charges that had been "zeroed out."

9

45. She did not look at every patient file as she felt, and the Court agrees, that would have consumed an inordinate amount of time and extra staff work.

46. She discovered three or four other files with large amounts that had been paid to Dr. Stewart and had not been deposited in the Main Account.

47. Dr. Stewart withdrew from the partnership on April 30, 1999.

48. Dr. Stewart later returned the $15,000 related to the first patient discrepancy.

49. Dr. Stewart did not take his patient treatment or billing files with him when he left and the testimony does not reveal why he did not.

50. Dr. Nicosia did not change the locks on the Shadyside office until after some chiropractic equipment was found to be missing.

51. Some time soon after Dr. Stewart left the partnership, the Greycat computer crashed.

52. Mrs. Nicosia attempted to have a computer specialist in the North Hills retrieve or restore the date on the hard drive but he was unable to and returned the hard drive to her.

53. No one deliberately destroyed the Greycat hard drive or deliberately disposed of the Greycat computer in order to conceal evidence.

54. No one sought a protective order regarding the preservation of Dr. Stewart's or Dr. Nicosia's records, whether paper or electronic in a timely manner before or after the lawsuit was filed.

55. The Quicken files remained available.

56. The full banking records were available until a fire in Dr. Nicosia's new office destroyed at least some of them if not all well after the lawsuit commenced and a protective order could have been obtained.

57. There is no credible evidence to support the allegation that the rent charged to Dr. Stewart for his portion of the shared premises, $2,000, was excessive.

58. There was sufficient evidence available for a reasonably accurate accounting of the revenue and expenses and profits and losses of the partnership to be made, although assembling that evidence was costly and time-consuming.

59. Mrs. Nicosia testified that, prior to Dr. Stewart's departure from the partnership, Mrs. Stewart had arranged with her to come into the office to print out all the Greycat files, which consisted of a pile of paper more than a foot high.

60. Mrs. Stewart was not called on rebuttal to deny that she had done this.

61. We therefore find that Mrs. Stewart made the complete Greycat billing printouts, probably to be sure Dr. Stewart had those billing records; we believe it is more likely than not that he had his own patient treatment records for his current patients in his Mt. Troy office and therefore only needed the Greycat printouts to be able to follow up regarding monies that might be due him from the Shadyside practice.

62. Plaintiff's expert accountant, Karl A. Jarek, CPA, was barred from testifying because he had not been asked to render an opinion regarding the question to be resolved by the Phase 2 trial, who owed how much to whom and why, applying paragraphs 7, 8, and 9 of Judge Johnson's order of September 14, 2005.

11

63. Mr. Jarek's expert report was limited to criticizing the methodology used by the court-appointed accountant; because he did not give any opinion in his report on what the final accounting under Judge Johnson's order should be, the objection to his testimony was sustained as irrelevant. See page 2 of his expert report, paragraphs 8-11, in which he states the assignment he was given and the scope of his report.

64. The expert witness called by the Defendant, Brandon Otis, a forensic accountant, was able to render an opinion in accordance with his expert report, which addressed the question before the Court, based on the data collected by the court-appointed accountant and by other items in the pleadings and elsewhere.

65. Mr. Otis was very clear in his explanation of how he arrived at his opinion and the Court finds his testimony and opinion highly credible.

66. The partnership between Dr. Stewart and Dr. Nicosia never made a profit as defined by Judge Johnson's order of September 14, 2005.

67. Dr. Stewart did not receive any payment related to profits of the partnership.

68. Dr. Nicosia did not receive any payments related to profits of the partnership.

69. The partnership suffered a net loss over its lifetime (August 1995-May 1999) of $18,562.00.

70. Dr. Stewart owes Dr. Nicosia the sum of $35,272.00, the amount needed to equalize the partners' contributions to the business over the years.

71. Dr. Stewart also owes Dr. Nicosia one-half of the "interest" he improperly retained of $736.66.

72. The grand total owed by Dr. Stewart to Dr. Nicosia is $35,640.33.

We accept Defendants' Proposed Findings numbers 1-8, 10-37, 40-42, 45, 47-49, 51-99, 101, 103, 109-112, 114, 118-123, 126, 130-133, 137-139, 174.

We accept the following proposed findings of Defendants as modified:

No. 38 – modified to reflect that Mrs. Stewart printed out copies of all the patient records on Greycat and removed those copies from the Chiropractic office.

No. 50 – modified to reflect that Dr. Stewart did not verify or count how many patient files were in the Centre Avenue office when he left and terminated the partnership.

No. 102 – modified to reflect that Judge Johnson's cited findings from the Phase 1 trial were also consistent with and confirmed by the evidence presented at the instant Phase 2 trial.

No. 134 - modified to reflect that Dr. Stewart is to repay Dr. Nicosia only one-half of the $736.66 retained as interest, i.e. $368.33.

Nos. 135 and 136 - modified to reflect that the total payment due from Dr. Stewart to Dr. Nicosia is $35,640.33.

We should point out that proposed findings of the Defendants that were neither accepted nor modified should not be regarded as having been implicitly rejected. Rather, they were either duplicative or irrelevant, at worst.

## DISCUSSION

The Plaintiff had the burden of proving the facts that would lead to an accounting that awards him his 50% share of the partnership profits. He failed to meet that burden. Instead the credible evidence shows that the partnership found to have existed between Plaintiff and Dr. Nicosia never made a profit.

The credible evidence also shows there was no spoliation of evidence by the Defendants. The credible evidence further shows that the paper files of Dr. Stewart's chiropractic practice were the best evidence of the amounts paid or due to that practice. Those paper files had been preserved by Defendants for several years, well after Dr. Stewart effectively abandoned them by not removing them from the Centre Avenue premises within a reasonable time after he left the premises permanently. The total number of patient files that could not be found among the many boxes of records was 27, a very small number.

We note that the credible evidence shows that Dr. Stewart caused equipment to be removed from the office but did not remove the individual treatment files, the individual billing files nor, possibly, the combined unpaid billing files for all his patients. He also did not take steps to procure a protective order on or about the time he filed the captioned actions or at any reasonable time thereafter. He cannot now be heard to complain that Dr. Nicosia took insufficient care to preserve those files when he himself took no steps to do so.

The Quicken files were all available, according to the credible testimony, and they were the best electronic evidence available to determine *all* of the income and expenses of the Chiropractic practice.

Greycat was obviously incorrect as to the three or four large balances that were improperly zeroed out. It cannot be deemed at all reliable as to amounts of income and there is no claim at all that it contained anything regarding expenses of the Chiropractic practice.

Gross income is not the basis for distributions to the partners under Judge Johnson's order. Each was only entitled to a 50% share of the profits, after deduction of expenses. Profits were best

14

determined from the Quicken records, accepted without question by Dr. Stewart for the duration of the partnership.

Lastly, contrary to the suggestions made by Plaintiff's counsel, Dr. Nicosia had no duty to charge Dr. Stewart a lower rent merely because they were friends. He and Mrs. Nicosia had the right to the fair market rental for the premises and there is absolutely no evidence to suggest that the $4,000 per month total rental, half of which was paid by Dr. Stewart, was excessively high or set in bad faith.

CONCLUSION

The accounting of the Court shows that Dr. Stewart must reimburse Dr. Nicosia $35,272.00 as calculated by Mr. Otis. He must also reimburse Dr. Nicosia one-half of the wrongfully withheld "interest," $368.33. The total he must pay to Dr. Nicosia is $35,640.33.

In accordance with the Rules of Court cited above, there is no separate verdict slip filed. This Decision constitutes the award of the Court.

By the Court

Friedman, J

8 June 2017

15

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | |
|---|---|
| DR. ROGER STEWART, | CIVIL DIVISION |
| Plaintiff, | Consolidated Cases known as GD-01-13980 (Equity) GD-01-14628 (Law) |
| vs. | |
| DR. GREGORY NICOSIA, individually, and DR. GREGORY NICOSIA, partner trading as ADVANCED DIAGNOSTICS, and ADVANCED DIAGNOSTICS, INC., | MEMORANDUM IN SUPPORT OF ORDER AND ORDER OF COURT |
| Defendants. | HONORABLE JUDITH L. A. FRIEDMAN |

Copies Served By First Class Mail Upon:

Glenn P. Cummings, Esquire
3915 Mt. Troy Road, First Floor
Pittsburgh, PA 15212

Paul Yagelski, Esquire
ROTHMAN GORDAN
Grant Building, 3rd Floor, 310 Grant Street
Pittsburgh, PA 15219

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

DR. ROGER STEWART,

     Plaintiff,

     vs.

DR. GREGORY NICOSIA, individually,
and DR. GREGORY NICOSIA, partner
trading as ADVANCED DIAGNOSTICS,
and ADVANCED DIAGNOSTICS, INC.,

     Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CIVIL DIVISION

Consolidated Cases known as
GD-01-13980 (Equity)
GD-01-14628 (Law)

## MEMORANDUM IN SUPPORT OF ORDER

The captioned actions were consolidated and were then set to be tried in three phases by the Honorable Livingstone M. Johnson, now fully retired. Judge Johnson tried Phase One and concluded that a partnership did exist between the parties and entered an order accordingly, on September 14, 2005. That order also set forth the matters which would be covered by Phase Two, the accounting. Phase Three was expected to handle the claims at law set forth at GD 01-14628.

In January 2015, the consolidated cases were assigned to the undersigned who entered a Decision dated June 8, 2017, after Phase Two of the trial. We believed that our factual findings during Phase Two left nothing to be tried in Phase Three and indicated in our Decision that we would enter an order cancelling that part of the trial. On June 27, 2017, we entered such an

1

order. Plaintiff then filed several separate Post-Trial Motions on July 7, 2017, and on July 27, 2017, Defendant filed various motions, including a Motion to Dismiss [Both] Parties' Remaining Claims as Moot.

By order dated August 10, 2017, we directed Plaintiff to file his answer to the Motion to Dismiss and also established a briefing schedule. The last, supplemental, briefs were filed by the parties on October 18, 2017, and after a review, we conclude that the Motion to Dismiss must be granted.

The claims at law filed by the Plaintiff at GD 01-14628 are set forth in an Amended Complaint [Doc. 13 at 14628] which was filed on May 28, 2002, and which was then itself amended on September 25, 2003 [Doc. 52 at 14628]. The claims are as follows:

Count 1, Breach of Contract, vs. Dr. Nicosia and the partnership.

Count 2, Wage Payment and Collection Law violations, vs. the partnership and Dr. Nicosia.

Count 3, Unjust Enrichment, vs. Dr. Nicosia and Advanced Diagnostics, Inc.

Count 4, Conversion of Chiropractic Equipment, vs. Dr. Nicosia and Advanced Diagnostics, Inc.

Count 5, Fraud, vs. Dr. Nicosia.

Count 6, Shareholder/Officer Participation in Fraudulent Activities and Piercing the Corporate Veil of Advanced Diagnostics, Inc., vs. Dr. Nicosia and Advanced Diagnostics, Inc.

Count 7, Fiduciary Duties (added on September 25, 2003, Doc. 52), vs. Dr. Nicosia and Advanced Diagnostics, Inc.

2

We believe that the parties agree that the corporate defendant, Advanced Diagnostics, Inc. was not involved in the partnership and that the claims against it are no longer being asserted. The trade name "Advanced Diagnostics" was, however, used by the partnership. See Decision, Findings of Fact no. 8 & 9.

All of the claims at law arise from the relationship between the parties, which Plaintiff, in Phase One, had successfully asserted was an "oral at-will partnership." However, during the Phase Two accounting, the material facts supporting each of these claims at law were decided adversely to Plaintiff. After consideration of the arguments of counsel, we conclude that the claims, as we suspected, are indeed moot. There is no count at law that remains to be tried. Crucial elements, if not all elements of each of the above claims, have already been decided, adversely to Plaintiff.

One important missing element is *harm to Dr. Stewart*. The accounting of the partnership revealed that Dr. Stewart suffered *no* harm.

Another missing element is wrongdoing by Dr. Nicosia. The accounting revealed that Dr. Nicosia had not acted wrongfully at all, and, in fact, that it was Dr. Stewart who did so, by, *inter alia*, misappropriating funds that should have gone into the partnership's "main account," the Advanced Diagnostics checking account at PNC Bank.

Another significant finding of fact in Phase Two is that the partnership made no profit so there was nothing to be distributed to Dr. Stewart. There can be no wrongful withholding of distributions if there was nothing to distribute.

Regarding the Wage Payment Law/Act violations, Plaintiff successfully contended that he and Dr. Nicosia were 50-50 partners and presented no evidence during the Phase Two

3

Accounting regarding unpaid salaries, an item that certainly should have been part of the accounting.

Regarding conversion, the evidence and factual findings at Phase Two belie Plaintiff's assertions that Dr. Nicosia converted chiropractic equipment to his own use.

The evidence and factual findings at Phase Two also make it clear that Dr. Stewart, not Dr. Nicosia, ended the partnership when he walked out at the end of April 1999.

CONCLUSION

Plaintiff has not presented any valid basis for his contention that the above-listed counts at law are still viable. The Motion to Dismiss must be granted. See Order filed herewith.

For housekeeping purposes, we have also stricken the judgment entered, prematurely, after denial of Plaintiff's post-trial motions filed as to Phase Two. See order filed separately.

By the Court

Friedman, J.

25 October 2017

4